# UNITED STATES DISTRICT COURT

**FILED**

for the

Eastern District of California

**MAR 08 2019**

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

| | |
|---|---|
| In the Matter of the Search of | ) |
| | ) |
| 3273 Juliet Road | ) |
| Stockton, California 95205 | ) |
| | ) |
| | ) |

Case No.

**2 1 9 - SW - 0 1 8 3 ___ AC**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

**SEE ATTACHMENT A-2, attached and incorporated by reference.**

located in the _____Eastern_____ District of _____California_____, there is now concealed *(identify the person or describe the property to be seized)*:

**SEE ATTACHMENT B, attached and incorporated by reference**

**SEALED**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. § 841(a)(1) | Distribution and Possession with Intent to Distribute Fentanyl |

The application is based on these facts:

**SEE AFFIDAVIT, attached and incorporated by reference.**

- ☑ Continued on the attached sheet.
- ☐ Delayed notice _____ days (give exact ending date if more than 30 _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

DEA Special Agent Robert L. Borkhuis
*Printed name and title*

Sworn to before me and signed in my presence.
Date: ___3/8/19___

_____
*Judge's signature*

City and state: Sacramento, California

Allison Claire, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT OF DEA SPECIAL AGENT ROBERT L. BORKHUIS IN SUPPORT OF SEARCH WARRANTS

I, Drug Enforcement Administration Special Agent Robert L. Borkhuis, being duly sworn, hereby state:

### SCOPE OF REQUESTED SEARCH WARRANTS

1. This affidavit is submitted in support of applications for warrants to search locations further described in **Attachments A-1** through **A-4**. The contraband, objects, and information for which we will search are described in **Attachment B**. Attachments A-1 through A-4 and Attachment B are incorporated by reference.

2. We request authority to search four locations:

   a. **Premises 1:** 2144 South Ash Street, Stockton, California, a residence more fully described in **Attachment A-1**.

   b. **Premises 2:** 3273 Juliet Rd, Stockton, California, a residence more fully described in **Attachment A-2**.

   c. **Vehicle 1:** A 2006 Jeep Grand Cherokee bearing California license plate 5SBE399 and more fully described in **Attachment A-3**.

   d. **Vehicle 2:** A 2006 red Ford Ranger bearing California license plate 7X37790 and more fully described in **Attachment A-4**.

3. I am currently investigating a conspiracies to distribute fentanyl and to possess fentanyl with the intent to distribute it. The investigation involves defendant Manuel FELIX-RIVERA and others in the Eastern District of California. The facts and information set forth in this affidavit are based upon my personal knowledge obtained during this investigation and other documents and records obtained during this investigation. Because I submit this affidavit for the limited purpose of setting forth probable cause for the requested search warrants, I have not included every fact known to me concerning this investigation. I have only included what I believe are adequate facts to establish probable cause that evidence of violations of Title 21, United States Code, Section 841(a)(1) will be found in the locations to be searched. However, I have not intentionally omitted any fact material to this Court's determination of probable cause to search the locations identified in **Attachments A-1** through **A-4**.

4. In addition, where I describe statements made by other people (including other special agents and law enforcement officers), the statements are described in sum, substance, and relevant part. Similarly, where I describe information contained in reports and other

documents or records in this affidavit, this information is also described in sum, substance, and relevant part.

## BACKGROUND AND EXPERTISE

5.   I am an "investigative or law enforcement officer of the United States" within the meaning of 18 U.S.C. § 2510(7) and am empowered by law to conduct investigations and felony arrests.

6.   I have been a DEA special agent since May 2018.  I am currently assigned to the Santa Rosa Resident Office of the San Francisco Field Division.  I am authorized and presently assigned to investigate and enforce violations of the Controlled Substance Act (CSA) and other violations of federal law.

7.   In June 2016, prior to my current assignment, I completed the Georgia Peace Officer Certification Academy in DeKalb County, Georgia.  During the 26-week training academy, I received basic instruction in police procedure, operations, criminal law, criminal procedure, interviews and interrogations, defensive tactics, firearm proficiency, first responder issues, use of deadly force, and many other topics.  This instruction also included a basic block of instruction on illegal drug identification and narcotics law enforcement.  I was employed by the DeKalb County Police Department between December 2015 and November 2017.  During my career with the DeKalb County Police Department, I served as a patrol officer assigned to the North-Central Precinct and received more than 1,100 hours of training and instruction.

8.   Between January 2018 and May 2018, I received 18 weeks of full-time, formalized training at the DEA Basic Agent Training Academy in Quantico, Virginia.  This training included but was not limited to drug identification, detection, and interdiction; undercover operations; money laundering techniques; transportation, concealment, and sales of narcotics; investigating individuals and organizations involved in the smuggling, cultivating, manufacturing, and illicit trafficking of controlled substances; interviews and interrogations; defensive tactics; firearm proficiency; and legal instruction.

9.   To remain up-to-date with current drug-trafficking trends, I also maintain regular contact with special agents and other law enforcement personnel.  I have had numerous conversations with other experienced DEA special agents, state officers, and local officers regarding narcotics and narcotics-related subjects in order to expand and develop my expertise in the areas of narcotics identification, sales, and possession for sale and methods of operation of narcotics traffickers.

10. I have been involved in the interviews of numerous cooperating sources and individuals involved in illegal trafficking in controlled substances. I have had numerous discussions regarding their various operations. I have read official reports of similar interviews by other experienced DEA special agents and other law enforcement officers experienced in drug-related investigations. As a result of my experience, I have encountered and become familiar with the day-to-day operations and the various tools, methods, trends, paraphernalia, and related articles used by various traffickers in their efforts to possess, import, conceal, and distribute controlled substances.

11. My training and experience is based on my formal training and on what I have learned from other DEA special agents, other federal agents, and other state and local law enforcement officers experienced in investigating controlled substance violations. Additionally, I have had contact with narcotics traffickers and informants and have discussed with them the manufacture, importation, concealment, packaging, sales, use, distribution, and transportation methods used by narcotics traffickers and drug trafficking organizations (hereinafter "DTO"s). As a result, I have become familiar with the operations and the various tools, methods, trends, paraphernalia, conveyances, and related articles used by various traffickers in their efforts to manufacture, import, conceal, package, sell, use, distribute, and transport narcotics. Since starting my career at DEA, I have participated in investigations involving seizures of fentanyl, fentanyl, heroin, THC extract, and marijuana. I have also participated in investigations involving undercover operations, physical surveillance, and monitoring the movements and habits of narcotics traffickers. I have participated in executing search and arrest warrants at narcotics trafficker residences, facilities, outbuildings, and vehicles.

12. In October 2018, I attended the 40-hour DEA Clandestine Basic Certification School in Quantico, Virginia. In this certification school, I learned the basics for identifying, mitigating risk, and safely dismantling clandestine laboratories. In November 2018, I attended the 24-hour California Narcotics Officer Association conference in San Diego, California. During this conference, I received training in confidential informant handling, dark web investigations, and narcotics interdiction investigations.

13. Through my training, experience, and interaction with other experienced special agents, task force agents, and other drug investigators, I have become familiar with the methods employed by drug traffickers to smuggle, safeguard, store, transport, distribute drugs, to collect and conceal drug related proceeds, and to communicate with other participants to accomplish such objectives. These methods include the use of telephones, pre-paid or debit calling cards, public telephones, wireless communications technology such as paging devices and cellular telephones, counter-surveillance, elaborately planned smuggling schemes tied to legitimate businesses, and use of codes in communications in an attempt to

3

avoid detection by law enforcement. Based on my training and experience, I also know that violators of the controlled substances laws often purchase telephones or subscribe to telephone service using false names and/or other individuals' names to avoid detection by law enforcement.

14. In addition to my personal knowledge, this affidavit is based on (1) information I obtained from related investigations; conversations with other law enforcement officers including oral and written investigative and laboratory reports that I received directly or indirectly from other law enforcement officials; (2) review and analysis of information received from various sources, including evidence provided pursuant to subpoenas and search warrants, such as GPS tracking data and pen register data; (3) physical surveillance conducted by law enforcement officials reported to me either directly or indirectly; (4) a review of public records, telephone toll records, and subscriber information; (5) information provided from confidential sources of information, cooperating defendants, and other sources of information working with law enforcement agencies; (6) a review of driver's license and automobile registration records; (7) records from various law enforcement databases, including but not limited to the National Law Enforcement Telecommunications System ("NLETS") and the National Crime Information Center ("NCIC"); (8) my training and experience as a DEA agent and; (9) the training and experience of other law enforcement officials with whom I consulted during this investigation and the preparation of this affidavit.

15. The facts and information set forth herein are true based upon my personal knowledge and observations, observations of other law enforcement personnel, observations of cooperating individuals as related to me, my review of investigative reports, notes, transcripts, review of intercepted communications, and discussions with other federal, state and local law enforcement officials. Because this affidavit is submitted for the limited purpose of supporting a criminal complaint and securing the requested arrest and search warrants, I have not included the details of every aspect of the investigation. I have set forth only the facts that I believe are necessary to establish a foundation for an order authorizing the arrest of the individuals named herein, a criminal complaint charging the individuals named herein, and the search and seizure of the properties identified in this affidavit.

## STATEMENT OF PROBABLE CAUSE

### *Summary of Investigation*

16. Since July 2018, the DEA Santa Rosa Resident Office, the DEA Sacramento District Office, the Santa Rosa Police Department (SRPD), and the San Joaquin Metropolitan Narcotics Task Force (METRO) – collectively referred to as the "Investigating Agencies" –

4

have been conducting a criminal investigation of Manuel FELIX-RIVERA, hereinafter referred to as FELIX-RIVERA. The investigation has also focused on FELIX-RIVERA's associates operating in Stockton, California. These associates include Cruz OJEDA-MARTINEZ.

17. During this investigation, a DEA confidential source ("CS1") has conducted several controlled purchases of fentanyl from FELIX-RIVERA. During these controlled purchases and the wider investigation, agents have used several investigative techniques – including surveillance, toll analysis, wire intercepts, and GPS location information – in their attempt to identify FELIX-RIVERA's associates, drug stash locations, and the destination of drug-related payments.

18. These techniques have allowed the Investigating Agencies to identify Stockton addresses 2144 South Ash Street (**Premises 1**) and 3273 Juliet Road (**Premises 2**) as locations that FELIX-RIVERA uses in connection with his drug trafficking activities.

19. FELIX-RIVERA has also used a 2006 black Jeep Grand Cherokee bearing California License plate 5SBE399 (**Vehicle 1**) and a 2006 red Ford Ranger bearing California license plate 7X37790 (**Vehicle 2**) to help facilitate his drug trafficking activities.

20. These techniques have also allowed the Investigating Agencies to identify Cruz Ojeda-Martinez a likely co-conspirator who has access to FELIX-RIVERA's narcotics supply and who uses **Vehicle 1** to make narcotics sales.

### *Initial Information on FELIX-RIVERA's Drug Trafficking Activities*

21. Law enforcement officers initially obtained information from a confidential source ("CS1") about FELIX-RIVERA's drug trafficking activities. CS1 has reported that FELIX-RIVERA's DTO operates in the city of Stockton, California, and in greater San Joaquin County, California.

22. CS1 cooperated with DEA and the Santa Rosa Police Department ("SRPD") between June 2018 and March 2019. While working as a confidential source, CS1 has provided consistently reliable information.

23. In 2014, CS1 sustained a felony conviction for California Health and Safety Code 11366, maintaining a place for distributing a controlled substance. In 2015 and 2016, CS1 also sustained probation violations relating to this original charge.

24. CS1 was initially cooperating in exchange for consideration regarding pending California charges for possession with intent to distribute fentanyl. These charges stemmed from a June 27, 2018, arrest. I interviewed CS1 for the first time on July 31, 2018. In about December 2018, the local district attorney's office said that CS1 has cooperated sufficiently to dismiss pending charges. Since then, no other form of consideration or inducement has been requested by or offered to CS1.

25. CS1's information concerning FELIX-RIVERA has been corroborated by public databases. For example, on July 31, 2018, CS1 positively identified FELIX-RIVERA, an active member of the DTO, using both a California Department of Motor Vehicles driver's license photograph and a Stockton Police Department photograph. Also on July 31, 2018, CS1 said that FELIX-RIVERA drove a black Jeep Cherokee. California Department of Motor Vehicle database records corroborated that FELIX-RIVERA was the registered owner of a 2006 black Jeep Grand Cherokee bearing California license plate 5SBE399. This affidavit also refers to the jeep as **Vehicle 1.**

26. Physical surveillance has also corroborated CS1's information. CS1 said that the windows of FELIX-RIVERA's Jeep Grand Cherokee had a dark tint. Law enforcement surveillance on August 21, 2018, confirmed that the windows on **Vehicle 1** possessed a dark tint. CS1 also said that an individual named Marguerite SPEAR also bought controlled substances from FELIX-RIVERA. On August 21, 2018, law enforcement witnessed a suspected drug transaction between SPEAR and FELIX-RIVERA. In addition, CS1 said that FELIX-RIVERA was associated with a taco truck but that s/he did not know the details of this relationship. Physical surveillance and database inquiries have corroborated the existence of FELIX-RIVERA's association with a taco truck.

27. The information provided by CS1 has, to the extent possible, been verified by other investigative techniques. For example, CS1 has provided information about FELIX-RIVERA's drug-trafficking habits. Specifically, CS1 told investigators that FELIX-RIVERA often conducts narcotics transactions in the Lowes parking lot located at 10342 Trinity Parkway in Stockton, CA. On December 3, 2018, investigators at this location surveilled a narcotics transaction between FELIX-RIVERA and another man named Robert Jacob PHILLIPS. This surveillance led to the subsequent arrest of PHILLIPS and the seizure of 30.0 grams of fentanyl. CS1 also told investigators that FELIX-RIVERA often conducts narcotics transactions in the community park parking lot located across from 2900 East Harding Way, Stockton, CA. On November 29, 2018, during CS1's fourth controlled purchase, FELIX-RIVERA instructed CS1 to meet him in this parking lot.

28. At the start of our investigation, CS1 provided FELIX-RIVERA's telephone number, (916) 640-3808 (hereinafter "Prior Telephone #1"). Though this number was subscribed in the

name of Martin Rivera, CS1 used Prior Telephone #1 to coordinate controlled purchases of fentanyl from FELIX-RIVERA on September 13, 2018, and on September 25, 2018.

29. CS1 later provided investigators with another phone number for FELIX-RIVERA, (209) 817-9691 (hereinafter "Prior Telephone #2"). Though this number was subscribed in the name of Guadalupe Quintero, CS1 used Prior Telephone #2 to coordinate two more controlled purchases on October 25, 2018, and on November 29, 2018.

30. As discussed below, CS1 has also provided other reliable information regarding FELIX-RIVERA's identity and CS1's conversations with FELIX-RIVERA. Agents have used other investigative techniques to corroborate much of this information.

31. On or about October 6, 2018, investigators learned that CS1 might have executed an unauthorized narcotics purchase from FELIX-RIVERA. Investigators subsequently asked CS1 about this. CS1 said that s/he was traveling with another person who made the purchase. CS1 said s/he didn't want to decline assistance because s/he didn't want to alert the other person to CS1's cooperation with law enforcement. Law enforcement officers re-notified CS1 that s/he would not receive protection for unauthorized narcotics purchases. On a later date, law enforcement officers also underscored to CS1 the necessity for communication between CS1 and law enforcement.

32. On or about March 5, 2019, investigators learned that CS1 might be attempting to schedule an unauthorized narcotics purchase from FELIX-RIVERA. CS1 executed this transaction on March 6, 2019. Before the transaction occurred, I left CS1 a voicemail indicating that she was deactivated as confidential source. I also began to complete paperwork necessary for this deactivation. After CS1 appeared to conduct an unauthorized transaction with FELIX-RIVERA on the evening of March 6, 2019, police officers arrested CS1 on state charges. She is no longer cooperating with the investigation.

33. Agents have never found CS1's information to be false. For all of these reasons, I consider CS1 reliable.

### *September 13, 2018: Controlled Purchase of Fentanyl from FELIX-RIVERA*

34. CS1 has conducted four controlled fentanyl purchases from FELIX-RIVERA. Their total weight was about 534.5 gross grams.[1]

---

[1] Agents took these gross gram measurements by weighing the controlled substance and its packaging inside two other, separate evidence bags. This technique likely overstates the weight of the fentanyl mixtures. However, agents took this approach to minimize their risk of fentanyl exposure.

35. In the days prior to September 13, 2018, CS1 used Prior Telephone #1 to negotiate a two-ounce fentanyl purchase from FELIX-RIVERA. On September 13, 2018, under the direction and control of DEA and SRPD, CS1 conducted a controlled fentanyl purchase.

36. In the morning of September 13, 2018, investigators watched FELIX-RIVERA leave **Premises 2**, walk over to **Vehicle 1**, and get inside. FELIX-RIVERA then drove about 1.5 miles to **Premises 1**.

37. There, FELIX-RIVERA parked **Vehicle 1** and manually opened the front metal gate that restricts access to the driveway. Next, FELIX-RIVERA pulled **Vehicle 1** into the driveway, parked, got out, and walked behind the main residence, out of view of investigators.

38. About 30 minutes later, FELIX-RIVERA emerged back into view, got into **Vehicle 1**, reversed it, and traveled directly to the deal location where CS1 was already waiting.

39. Prior to the transaction, I met with and searched CS1's vehicle for contraband or weapons with negative results. I also outfitted CS-1 with a concealed transmitter and recorder device. I then followed CS1 directly to the deal location.

40. During the transaction, CS1 met with FELIX-RIVERA at a commercial parking lot located at 10342 Trinity Parkway, Stockton, CA. CS1 got out of his/her vehicle and entered the front passenger seat of **Vehicle 1**. Inside, CS1 paid FELIX-RIVERA $3,000.00 for about 119.1 gross grams of a fentanyl mixture. A few moments later, CS1 got out of **Vehicle 1** and returned to his/her vehicle.

41. Following the transaction, agents followed CS1 as s/he drove to a neutral location. Agents retrieved the purchased fentanyl mixture from CS1. They also debriefed CS1 regarding the transaction that had just occurred. During this conversation, CS1 told investigators that FELIX-RIVERA stored narcotics and money in a hidden compartment built into the front dashboard of **Vehicle 1**. CS1 said that FELIX-RIVERA accessed the compartment by removing a faux wood trim from around the Jeep's center console.

42. Agents found that the fentanyl mixture CS1 provided was packaged inside two Ziploc-style bags, rolled tightly, and then completely wrapped in a green plastic material. Investigators later used a TheromoFisher Scientific TruNarc instrument to conduct a field test on the substance CS1 had purchased from FELIX-RIVERA. It gave a presumptively positive result for the presence of fentanyl. Results from DEA's Western Regional Laboratory are pending.

43. Agents observed a similar pattern in FELIX-RIVERA's other narcotics transactions: His customers met him in a public parking lot, often this one, and spent a short period of time in his car in order to execute their apparent transactions. This held true for all of CS1's controlled purchases and seemed to be the case with SPEAR and PHILLIPS, as well. In addition, the fentanyl mixtures purchased by CS1 and seized from PHILLIPS were all wrapped in a similar, green plastic material.

### *September 25, 2018: Controlled Purchase of Fentanyl from FELIX-RIVERA*

44. On September 20, 2018, CS1 called Prior Telephone #1 and had a consensually-recorded conversation with FELIX-RIVERA. Agents later verified this call by analyzing toll call detail records for Prior Telephone #1. This conversation included the following exchange:
    a. CS1: "… Are you busy this Tuesday?"
    b. FELIX-RIVERA: "(unintelligible) … in the morning."
    c. CS1: "Oh. It's ok in the morning?"
    d. FELIX-RIVERA: "Yeah."
    e. CS1: "Like what time?"
    f. FELIX-RIVERA: "… before 11."
    g. CS1: "Like 9?"
    h. FELIX-RIVEA: "(unintelligible) like 9."
    i. CS1: "Umm, so no, I'll see you on Tuesday. I'll do, I'll do three."
    j. FELIX-RIVERA: "Oh, ok."

45. I later discussed this conversation with CS1. I also considered it in the context of the events, training, experience, and knowledge described above. Based on this analysis, I believe that, during this communication over Prior Telephone #1, FELIX-RIVERA and CS1 were discussing meeting on September 25, 2018, to exchange three ounces of fentanyl.

46. On September 24, 2018, CS1 exchanged a series of preserved text messages with Prior Telephone #1. Agents later verified this electronic communication by reviewing call detail records and conducting a toll analysis of Prior Telephone #1. During the conversation, the following was discussed:
    a. CS1: "See you at 7 or 8Am let me know what time is better".
    b. FELIX-RIVERA: "Ok os good……You know how many".
    c. CS1: "3 but you want me there by 8?"
    d. CS1: "Is 8 AM OK?"
    e. FELIX-RIVERA: "Yes is ok".
    f. FELIX-RIVERA: "Let me know when you leave".

9

47. I later discussed these messages with CS1. I also considered them in the context of subsequent investigation events; my training, experience, and knowledge of this investigation; and the training, experience, and knowledge of other agents and task force officers involved in this investigation. Based on this analysis, I believe that, during the text messages described above, FELIX-RIVERA and CS1 were using Prior Telephone #1 to discuss the pending transaction of three ounces fentanyl. Specifically, they were determining the quantity of fentanyl that they would exchange and a time for the transaction to occur.

48. On next day – September 25, 2018, under the direction and control of DEA and SRPD, CS1 conducted a controlled fentanyl purchase from FELIX-RIVERA. In the hours before the transaction, CS1 and FELIX-RIVERA exchanged the following text messages via Prior Telephone #1:
    a. CS1: "I'm leaving".
    b. FELIX-RIVERA: "Ok let me know when 40".
    c. CS1: "OK".
    d. CS1: "40 min".
    e. FELIX-RIVERA: "Ok".
    f. FELIX-RIVERA: "1".

49. I later discussed these preserved text messages with CS1. I also considered them in the context of the events, training, experience, and knowledge described above. Based on this analysis, I believe that, during this electronic communication, FELIX-RIVERA and CS1 were using Prior Telephone #1 to coordinate when they would meet to conduct the fentanyl transaction.

50. Before the transaction, I met with CS1 and searched his/her vehicle for contraband and weapons with negative results. I also outfitted CS1 with a concealed transmitter and recording device. I then followed CS1 directly from our location to the deal location, a commercial parking lot located at 10342 Trinity Parkway, Stockton, CA.

51. Earlier that morning, investigators had seen FELIX-RIVERA leave **Premises 2,** walk over to **Vehicle 1,** and get inside. From here, FELIX-RIVERA drove directly to **Premises 1**.

52. There, FELIX-RIVERA got out of **Vehicle 1,** opened the metal gate blocking the driveway, drove into the property, and parked. An aerial surveillance agent could see FELIX-RIVERA walking southeast to the door of the smallest residential structure on the property. FELIX-RIVERA subsequently paused, opened the door, and entered the structure.





54. About 13 minutes later, FELIX-RIVERA left **Premises 1** and got back into **Vehicle 1**. He reversed the jeep and traveled directly to the deal location where CS1 was already waiting.

55. To execute the transaction, CS1 got out of his/her car and got into the front passenger seat of **Vehicle 1**. There, CS1 paid FELIX-RIVERA $4,500 for about 150 gross grams of a mixture containing fentanyl.

56. Following the transaction, FELIX-RIVERA entered the commercial shopping center and returned a short time later. Investigators then watched FELIX-RIVERA drive directly back to **Premises 2** and go inside.

12

57. Following the transaction, I followed CS1 directly to a neutral location, debriefed CS1 regarding this transaction, and retrieved the purchased fentanyl. The mixture was held inside two Ziploc-style bags and wrapped in a green, plastic material. The DEA Western Regional Laboratory later confirmed the mixture was fentanyl hydrochloride with a purity of about 14%. I also debriefed CS1 regarding the transaction that had just occurred.

### *October 25, 2018: Controlled Purchase of Fentanyl from FELIX-RIVERA*

58. On October 24, 2018, CS1 called Prior Telephone #2 and consensually-recorded his/her conversation with FELIX-RIVERA. Agents later verified this call by analyzing toll call detail records for Prior Telephone #2. During this conversation, CS1 and FELIX-RIVERA shared the following exchange:
    a.   CS1: "… can we meet tomorrow?"
    b.   FELIX-RIVRA: "Yeah, ok."
    c.   FELIX-RIVERA: "You know how many?"
    d.   CS1: "Three."
    e.   FELIX-RIVERA: "Oh, ok."

59. I later discussed this conversation with CS1. I also considered it in the context of the events, training, experience, and knowledge described above. Based on this analysis, I believe that, during this communication over Prior Telephone #2, FELIX-RIVERA and CS1 were discussing meeting on October 25, 2018, to exchange three ounces of fentanyl.

60. On October 25, 2018, before the transaction, I met with CS1 at a predetermined, neutral location. I searched CS1's vehicle for contraband and weapons with negative results. I also outfitted CS1 with a concealed transmitter and recorder device. I then followed CS1 directly from our location to the transaction location, a commercial parking lot located at 10342 Trinity Parkway, Stockton, CA.

61. On the morning of October 25, 2018, investigators saw FELIX-RIVERA leave **Premises 2**, get into **Vehicle 1**, and drive to **Premises 1**. There, FELIX-RIVERA parked **Vehicle 1**, opened the gate, pulled **Vehicle 1** forward, and parked. FELIX-RIVERA got out of **Vehicle 1** and walked behind the **Premises 1**'s main residence and out of view of investigators.

62. About 10 minutes later, agents saw FELIX-RIVERA leaving **Premises 1** in **Vehicle 1.** FELIX-RIVERA then drove directly to the deal location where CS1 was already waiting.

63. Before the transaction, I met with CS1 and searched his/her vehicle for contraband and weapons with negative results. I also outfitted CS1 with a concealed transmitter and

13

recording device. I then followed CS1 directly from our location to the deal location.

64. There, CS1 got out of his/her vehicle, got into the front passenger seat of **Vehicle 1**, and paid FELIX-RIVERA $4,500.00 for about 144 gross grams of a mixture believed to contain fentanyl.

65. After the transaction, I followed CS1 directly to a neutral location, where I debriefed CS1 regarding the transaction and retrieved the purchased fentanyl. As with the previous purchases, the mixture was packaged inside of two Ziploc style bags and wrapped in a green plastic material. Results from DEA's Western Regional Laboratory are pending.

### *November 29, 2018: Controlled Purchase of Fentanyl from FELIX-RIVERA*

66. In the days prior to November 29, 2018, CS1 used Prior Telephone #2 to coordinate another transaction with FELIX-RIVERA.

67. On November 29, 2018, I met with CS1 at a predetermined, neutral location. I searched CS1's vehicle for contraband or weapons with negative results. I also outfitted CS-1 with a concealed transmitter and recorder device. I then followed CS1 directly from our location to the transaction location, the community park located across from 2900 East Harding Way, Stockton, CA.

68. FELIX-RIVERA arrived at the park in **Vehicle 2**. During the transaction, CS1 sat in the front passenger seat of **Vehicle 2** and paid FELIX-RIVERA $3,000.00 for about 121.4 gross grams of a mixture believed to contain fentanyl. Results from DEA's Western Regional Laboratory are pending. Following the transaction, I followed CS1 directly to a neutral location, where I retrieved the purchased fentanyl mixture and debriefed CS1 regarding the transaction that had just occurred.

### *December 3, 2018: Purchase of Fentanyl from FELIX-RIVERA*

69. During surveillance on December 3, 2018, phone number 707-596-0312 – which is registered to Robert Jacob PHILLIPS – was in constant electronic and wire communication with a Prior Telephone #2.

70. On the same day, a GPS tracker on **Vehicle 1** indicated that the car had visited **Premises 1** earlier in the day and then traveled to FELIX-RIVERA's suspected place of employment at 2900 East Harding Way, Stockton, CA. From there, **Vehicle 1** had traveled to the commercial parking lot located at 10342 Trinity Parkway, Stockton, CA.

71. Law enforcement officers saw PHILLIPS meet with FELIX-RIVERA in this commercial parking lot. Agents had previously seen FELIX-RIVERA execute narcotics sales in this parking lot.

72. In a pattern similar to these other purchases, San Joaquin Metropolitan Narcotics Task Force ("METRO") agents saw **Vehicle 1** enter the parking lot. A few moments later, a gold Dodge Durango bearing California license plate 4UIN060 entered the same parking lot and parked near **Vehicle 1**. The agents saw PHILLIPS, whom they recognized from his California DMV driver's license photo, exit the Durango and get into **Vehicle 1**'s front passenger seat. A short time later, PHILLIPS got out of **Vehicle 1** and appeared to clinch an object in his fist. PHILLIPS then left the Stockton parking lot at about 6:56 p.m.

73. Agents followed PHILLIPS's car until about 7:15 p.m. During this time, his car left the parking lot, stopped about two minutes later at an AM/PM gas station – where PHILLIPS stayed near his car to buy gas and did not appear to meet with anyone else. The car then merged onto northbound Interstate 5 and, after traveling several miles, then merged onto westbound Highway 12. At this time, the agents stopped surveillance. They reinitiated surveillance at about 8:29 p.m., when they saw PHILLIPS's car traveling westbound on Highway 116 at Stage Gulch Road. This location is about 73 miles from the intersection of Interstate 5 and Highway 12. On that day, agents estimated that it would take a car about 82 minutes to travel this distance without stopping; they reacquired observation of PHILLIPS's car in about 81 minutes, which indicated that he had been traveling on the highway for all of this intervening time and had not stopped elsewhere.

74. Officers executed a traffic stop on PHILLIPS's car four miles later, at Highway 116 and Baywood Drive. He had not made any intervening stops. PHILLIPS provided consent to search his car. Officers arrested him upon finding about 0.2 grams of suspected methamphetamine in the center console.

75. Upon his entering the jail, officers searched PHILLIPS per Sonoma County Sheriff's policy and found in his pants about 30.0 grams of a mixture that PHILLIPS said was heroin. However, it later field tested and revealed a presumptively positive for the presence of fentanyl. The fentanyl seized from PHILLIPS was packaged in the same manner as fentanyl that CS1 had purchased from FELIX-RIVERA on four other occasions.

### *January 24, 2019: Surveillance of Likely Drug Purchase from FELIX-RIVERA*

76. On January 24, 2019, information relayed from the GPS tracker affixed to **Vehicle 1** indicated that that it was traveling in the direction of the commercial parking lot located at

10342 Trinity Parkway, Stockton, CA. A METRO agent then observed PHILLIPS in his gold Dodge Durango. PHILLIPS met with FELIX-RIVERA in the parking lot.

### *March 1, 2019: Surveillance of Likely Drug Purchase from OJEDA-MARTINEZ*

77. On February 26, 2019, the Honorable Judge Kimberly J. Mueller authorized the interception of wire and electronic communication for telephone (209) 451-8975 (the Current Telephone) for 30 days.

78. This phone number is subscribed to Martin Martinez. However, by conducting a common call analysis of more than ten of Prior Telephone #2's most-frequent contacts, agents identified this Current Telephone as FELIX-RIVERA's likely new phone number. They asked to meet with CS1, who agreed to conduct a cold call that would test this theory. On January 23, 2019, the case agent dialed the phone number for the Current Telephone on CS1's phone. Then, under the direction and control of DEA, CS1 conducted a consensually-recorded conversation and later confirmed that the voice of the other person on the line belonged to FELIX-RIVERA.

79. On March 1, 2019, at 8:50 a.m., surveillance agents intercepted the following Spanish-language call between the Current Telephone and a man using (209) 828-6764. Agents identified FELIX-RIVERA as the user of the Current Telephone. Based on their investigation, they believed Cruz Ojeda-Martinez was the man using (209) 828-6764.

80. The phone number (209) 828-6764 is subscribed to Nohemi Aguilar. Aguilar and Cruz Ojeda-Martinez both list 415 West Sixth Street, Stockton, CA as the addresses on their California driver's licenses.

81. Based on our investigation, I believe that Cruz Ojeda-Martinez is the brother of Mirabel Ojeda-Martinez, who is – in turn – believed to be FELIX-RIVERA's romantic partner. Agents have seen Cruz Ojeda-Martinez entering the residence at **Premises 2** with and without FELIX-RIVERA. They have also seen Cruz Ojeda-Martinez driving **Vehicle 1**, which is registered to ~~Mirabel Ojeda-Martinez~~ AC
FELIX-RIVERA

82. During the March 1, 2019 call, the people identified as FELIX-RIVERA and Cruz OJEDA-MARTINEZ shared the following exchange:
   a. OJEDA-MARTINEZ: "Hey, man?"
   b. FELIX-RIVERA: "What's up?"
   c. OJEDA-MARTINEZ: "Just one, man. Well, yes… because the, because it is just for the guy because Guera sent a message that maybe no."
   d. FELIX-RIVERA: "Oh, okay."

    e.    OJEDA-MARTINEZ: "She says [U/I] a message just now. She just said, 'Never mind.' She said, 'I will let you know,' but I think it is for yes for the guy."

    f.    FELIX-RIVERA: "Oh, well, the two are there."

    g.    OJEDA-MARTINEZ: "Ah! They are there?"

    h.    FELIX-RIVERA: "Yes. I left them there."

    i.    OJEDA-MARTINEZ: "Ah, just leave them there, I'm going, I'm going to take it [U/I] to the guy."

    j.    FELIX-RIVERA: "Okay then."

    k.    OJEDA-MARTINEZ: "All right"

    l.    FELIX-RIVERA: "Bye."

83. Based on my knowledge, training, and experience, I believe that, in this conversation, FELIX-RIVERA told Cruz Ojeda-Martinez that there were two units of a controlled substance waiting for Ojeda-Martinez – either in a stash location or in **Vehicle 1's** hidden compartment – that he could sell to an unknown man.

84. At about 4:40 p.m., investigators saw **Vehicle 1** enter the parking lot at 2053 East Mariposa Road in Stockton, CA. Having previously seen Cruz Ojeda-Martinez's California DMV photo, investigators confirmed that Ojeda-Martinez was driving **Vehicle 1**.

85. A few minutes later, a gray Chrysler 300 bearing California license plate 5CKK456 entered the lot and parked adjacent to **Vehicle 1**. Having previously seen a California DMV photo for a man named Juan Castillo, investigators confirmed that Castillo was driving the Chrysler. He got out and sat in the front seat of **Vehicle 1**. A few moments later, Castillo got out of **Vehicle 1** and sat in the Chrysler 300. Both cars then left the parking lot.

86. Based on my knowledge, training, and experience, I believe that, in this encounter, Cruz Ojeda-Martinez had the narcotics in **Vehicle 1** and sold an unknown quantity of narcotics to Castillo.

### *March 5, 2019: Surveillance of Likely Drug Purchase from OJEDA-MARTINEZ*

87. On March 5, 2019, at 4:07 p.m., surveillance agents intercepted the following Spanish-language call between FELIX-RIVERA on the Current Telephone and (209) 828-6764, believed to be used by Cruz Ojeda-Martinez:

    a.    FELIX-RIVERA: "What is up, what is up?"

    b.    OJEDA-MARTINEZ: "What is going on? Hey, listen?"

    c.    FELIX-RIVERA: "Yes?"

    d.    OJEDA-MARTINEZ: "Did you bring what I asked you for the other day?"

e.   FELIX-RIVERA: "Yes, it is right there."
f.   OJEDA-MARTINEZ: "Oh. Are, are the thing right there?"
g.   FELIX-RIVERA: "It is just one, right?"
h.   OJEDA-MARTINEZ: "Yes. You are not going out?"
i.   FELIX-RIVERA: "No, I was going… I was not going to go out… I was going to go out there to town. No, I will, I will, not until tomorrow…"
j.   OJEDA-MARTINEZ: "Oh, good so then I can…"
k.   FELIX-RIVERA: [U/I]
l.   OJEDA-MARTINEZ: "Yes, because the guy called me."
m.   FELIX-RIVERA: "Oh, okay."
n.   OJEDA-MARTINEZ: "All… then, then right now, then."
o.   FELIX-RIVERA: "Okay, then."
p.   OJEDA-MARTINEZ: "All right, then."

88.   Based on my knowledge, training, and experience, I believe that, in this conversation, Ojeda-Martinez asked FELIX-RIVERA if there were narcotics that he could sell to an unknown man. FELIX-RIVERA confirmed that Ojeda-Martinez only needed one narcotic unit quantity.

89.   At about 5:17 p.m., investigators saw Cruz Ojeda-Martinez get into **Vehicle 1** while it was parked at **Premises 2**. Ojeda-Martinez then drove south on Highway 99. At about 5:27 p.m., Ojeda-Martinez arrived at the AM/PM gas station located at 4855 CA-99 in Stockton. There, he met with an occupant driving the same Chrysler 300 that agents saw on March 1, 2019. A few moments later, both parties drove separately away from the area.

90.   Based on my knowledge, training, and experience, I believe that Cruz Ojeda-Martinez sold an unknown quantity of narcotics that he previously confirmed with FELIX-RIVERA to be inside **Vehicle 1** to Castillo.

### *More Information about Premises 1*

91.   PG&E records indicate that the account holder at **Premises 1** is Miguel Rosas-Castillo.

92.   Agents have seen a black Mitsubishi sedan bearing California license plate 7UVP651 at **Premises 1**. The car is registered to Cardenas Zenaida at the **Premises 1** address.

93.   A trash search is the process of collecting and examining a subject's discarded trash. On November 7, 2018, law enforcement conducted a search of the trash discarded at 2144 South Ash Street, Stockton, CA. The search provided little evidentiary value. Investigators mostly found household items and those belonging to the suspected residents

18

of the main dwellings of 2144 South Ash Street, Stockton, CA.  These residents do not appear to be affiliated with the FELIX-RIVERA DTO.

### *More Information about Premises 2*

94. PG&E records for **Premises 2** indicate that the account holder is Mirabel Ojeda-Martinez. Based on this investigation, I believe that Mirabel Ojeda-Martinez is in a romantic relationship with FELIX-RIVERA and is the mother of his children.

95. Geolocation pings on the Current Telephone and on Prior Telephone #1 indicate that these phones are or were at **Premises 2** almost every night and for other long periods of time. Because I believe that FELIX-RIVERA was the primary user of these phones, I believe this information indicates that he often sleeps at **Premises 2** and likely lives there.

96. Another telephone (209-707-5111) is also subscribed to FELIX-RIVERA at **Premises 2**.

### *More Information about Vehicle 1*

97. California Department of Motor Vehicles records show that **Vehicle 1** is registered to Manuel FELIX-RIVERA at 8758 North Highway 99, Apt #3 in Stockton, CA.

### *More Information about Vehicle 2*

98. A search California Department of Motor Vehicles records shows that the **Vehicle 2** is registered to Gabriella Ojeda-Martinez at **Premises 2**.  Based on our investigation, we believe that Gabriella Ojeda-Martinez is a sister of Mirabel Ojeda-Martinez, FELIX-RIVERA.

### *Summary of Evidence Related to Search Locations*

99.  **Premises 1:**  2144 South Ash Street, Stockton, California, a residence more fully described in **Attachment A-1**:
    a. FELIX-RIVERA traveled to this address and stayed for only a brief period of time immediately before controlled fentanyl purchases on:
        i. September 13, 2018;
        ii. September 25, 2018; and
        iii. October 25, 2018.
    b. FELIX-RIVERA traveled to this address, then went to his place of employment, and then traveled to a controlled fentanyl purchase on November 29, 2018.

    c. FELIX-RIVERA traveled to this address and stayed only a brief period of time the day of a likely controlled substance transaction on December 3, 2018.

    d. FELIX-RIVERA traveled to this address and stayed only a brief period of time the day of a likely controlled substance transaction on March 6, 2019.

100. **Premises 2:** 3273 Juliet Rd, Stockton, California, a residence more fully described in **Attachment A-2**:

    a. This home appears to be FELIX-RIVERA's residence.

    b. FELIX-RIVERA traveled directly from this location to **Premises 1** before initiating controlled fentanyl purchases on:

        i. September 13, 2018;

        ii. September 25, 2018; and

        iii. October 25, 2018.

101. **Vehicle 1:** A 2006 Jeep Grand Cherokee bearing California license plate 5SBE399 and more fully described in **Attachment A-3**:

    a. This vehicle is registered to FELIX-RIVERA.

    b. FELIX-RIVERA conducted controlled fentanyl purchases inside this vehicle on:

        i. September 13, 2018;

        ii. September 25, 2018; and

        iii. October 25, 2018.

    c. FELIX-RIVERA likely conducted a controlled substance transaction in this vehicle on December 3, 2018.

    d. Ojeda-Martinez likely conducted controlled substance transactions in this vehicle on

        i. March 1, 2019; and

        ii. March 5, 2019.

    e. CS1 told investigators that FELIX-RIVERA stored narcotics and money in a hidden compartment built into the front dashboard of **Vehicle 1**.

    f. FELIX-RIVERA likely conducted a controlled substance transaction in this vehicle on March 6, 2019.

102. **Vehicle 2:** A 2006 red Ford Ranger bearing California license plate 7X37790 and more fully described in **Attachment A-4**:

    a. FELIX-RIVERA conducted controlled fentanyl purchase inside this vehicle on November 29, 2018.

    b. This vehicle is registered to Gabriella Ojeda-Martinez. Based on our investigation, we believe that Gabriella Ojeda-Martinez is a sister of Mirabel Ojeda-Martinez, FELIX-RIVERA.

### *Conclusion*

103. Based on the above information, I believe there is probable cause to believe that FELIX-RIVERA has committed violations of 21 U.S.C. § 841(a)(1).

104. I believe that FELIX-RIVERA lives at **Premises 2** and uses **Premises 1** to store his controlled substances supply. I also believe that FELIX-RIVERA and Ojeda-Martinezuse **Vehicle 1** and **Vehicle 2** to facilitate their drug trafficking activities. I believe each of these locations may contain evidence of the conspiracy and of fentanyl distribution. I base this conclusion on my training and experience; on FELIX-RIVERA's fentanyl sales; on surveillance of meetings between FELIX-RIVERA, CS1, and others; and on other surveillance of these locations.

## AFFIANT'S EXPERIENCE REGARDING ITEMS TO BE SEIZED

105. Based on my training and experience and on consultations with other federal, state and local law enforcement personnel, I believe the following to be true:

106. Persons involved in the distribution of controlled substances often maintain at their residences, outbuildings, secondary residences, businesses, and vehicles, quantities of controlled substances, as well as paraphernalia for manufacturing, use, packaging, and distribution of controlled substances. Drug traffickers also maintain records relating to their trafficking activities in these same places. These records include personal calendars, address/telephone books, and papers reflecting the names, addresses, pager, telephone, and fax numbers relating to their drug trafficking associates. These records can be in written form. Drug traffickers also keep stored messages and telephone numbers relating to their trafficking activities within electronic devices. Further, drug traffickers often keep photographs and audio/video recordings depicting themselves and their associates, as well as their assets and controlled substances. They may also keep electronic equipment used for counter surveillance including scanners, cameras, monitors, and anti-bugging devices.

107. Premises and vehicles used by individuals involved in drug dealing usually contain articles of personal property showing the identity of persons occupying, possessing, residing in, owning, frequenting or controlling the premise or property.

108. Persons involved in the distribution of controlled substances often maintain records and ledgers listing their trafficking activities in these same places. These records are kept to keep track of the ordering, purchasing, storage, distribution and transportation of controlled substances. After drugs are sold, documentary records and ledgers often remain for long periods of time to memorialize past transactions, track the status of accounts receivable and

accounts payable, and to record the names and telephone numbers of suppliers, customers and co-conspirators. These records are often maintained not only on paper, but also as electronic or digital data in the form of computer hardware and software.

109. Individuals involved in drug trafficking often use telephones, cellular telephones, electronic pagers, beepers, e-mail devices, text messaging, and voice mail and/or answering machines to conduct their business. Individuals involved in drug trafficking must often rely on others to obtain drugs and to help obtain, market, distribute, and/or protect drugs. To achieve some of the aforementioned objectives, I am aware that drug distributors will often, among other methods, have a courier transport drugs or drug proceeds or ship controlled substances/drug proceeds through the mail or by common carrier. Evidence related to the identities of these co-conspirators are often maintained in these locations.

110. Individuals involved in drug trafficking often maintain large amounts of U.S. currency to maintain and finance their on-going drug business. In addition, assets generated by their drug business are typically kept on-hand by drug dealers to avoid detection by authorities and/or reporting requirements. Individuals involved in drug trafficking often attempt to legitimize the source of these profits. In order to do this, they attempt to secrete, transfer and conceal the money by, among other way: (a) Placing assets in names of nominees to avoid detection, while still maintaining control of the assets (S); (b) Laundering money through what appears to be a legitimate business or businesses; (c) Hiding money in their homes, safes, or safety deposit boxes; (d) Using money to buy assets which are hard to trace by law enforcement. Records of these transactions are often found in the aforementioned locations.

111. Additionally based on my training and experience and the training and experience of other investigators, I know persons involved in narcotic trafficking acquire personal and real property with their narcotic proceeds, and maintain evidence of financial transactions related to obtaining, transferring, secreting, or the spending of large sums of money made from drug trafficking activities. These records include bank statements, passbooks, money drafts, checkbooks, tax returns, loan statements, escrow files, and wire transfer records. Persons involved in drug trafficking will often convert the currency into cashier's checks, bearer bonds, precious metals, gold, diamonds, and other jewelry in an attempt to hide large amounts of currency, and that evidence of such will be located at the described locations.

112. Individuals involved in narcotics trafficking often take, or cause to be taken, photographs of themselves, their associates, their property, and/or their drugs, and usually maintain these photographs in the aforementioned locations.

22

113. Individuals involved in drug trafficking often maintain weapons, firearms, and ammunition on their person, in their residences, and/or in their vehicles in order to protect themselves and guard their drugs and drug profits, and for enforcement purposes during drug transactions. These weapons and firearms can be used, and often are used, as an instrumentality of the crime of drug possession and distribution. Therefore, I am requesting permission to seize weapons, firearms, and ammunition that may be found at the premises or in the vehicles to be searched, as indicated in the Attachment B attached to each of the locations requested.

114. Individuals involved in drug trafficking often conceal evidence of their involvement in vehicles and outbuildings in order to prevent detection and seizure by law enforcement conducting lawful search warrants at residences. Therefore I am requesting permission to search all outbuildings located at each of the locations requested.

115. Your affiant further believes that persons involved in the distribution of drugs will store items, further described in Attachment B, which is incorporated herein by reference, and that those items are used by drug traffickers in furtherance of their drug trafficking, or are obtained by drug traffickers as a result of their drug trafficking.

116. Based on my training, experience and conversations with other experienced agents, I am familiar with the methods and practices used by individuals and organizations involved in illicit activities that generate large amounts of income. These methods include cash purchases, the purchasing of numerous monetary instruments with cash in amounts less than $10,000, the use of aliases and nominees, the use of businesses as "front" in an attempt to legitimize and conceal their activities and the use of "off-shore" banking in an attempt to break the paper trail. These and other schemes are commonly referred to as "money laundering".

117. Individuals normally maintain records of their financial activity, such as receipts for expenditures by cash and check, bank records, and other financial documents, in their personal residences. Furthermore, individuals engaged in an income-producing business keep records of the financial activities of the business for numerous reasons and often use accounts to complete financial statements and tax returns for their business and personal returns.

118. Persons engaged in illegal activities and/or money laundering frequently retain records of their transactions within their residence, place of business, rented storage units, vehicles, or other places under their control. These records may be in the form of written notes and correspondence, receipts, negotiated instruments, contracts, bank statements, and other records. Records of this kind are also often stored on computer media.

119. Persons engaged in illegal activities and/or money laundering often maintains such records or long period of time, particularly when they are involved in ongoing criminal conduct over a long period of time.  Based on my experience and review of *United States v. Greany*, 929 F.2d 523 (9th Cir. 1991), where there is evidence that the criminal activity is long-term ongoing criminal activity, it is more likely that evidence will be kept for long periods of time.  In addition, based on *United States v. Angulo-Lopez*, 791 F. 2d 1394, 1399 (9th Cir. 1986), I believe that evidence of a continuous pattern of drug dealing may be found where the drug dealers reside.

120. There are many reasons why criminal offenders maintain evidence for long periods of time. The evidence may be innocuous at first glance (e.g., financial, credit card and banking documents, travel documents, receipts, documents reflecting purchases of assets, personal calendars, telephone and address directories, checkbooks, video recordings and photographs, utility records, ownership records, letters and notes, tax returns and financial records, escrow files, telephone and pager bills, keys to safe deposit boxes, packaging materials, computer hardware and software), but have significance and relevance when considered in light of other evidence.  The criminal offender may no longer realize he/she still possesses the evidence.

121. Individuals who amass proceeds from illegal activities routinely attempt to further that conduct and/or conceal the existence and source of their funds by engaging in financial transactions with domestic and foreign institutions, and others, through all manner of financial instruments, including cash, cashier's checks, money drafts, traveler's checks, wire transfers, etc.  Records of such instruments are routinely maintained at the individual's residence or place of business.

122. The terms "evidence" and "documents" as used above include all of the items of evidence more fully described in Attachment B in whatever form and by whatever means such evidence or documents, their drafts or their modifications may have been crated or stored.

## **REQUEST TO SEAL**

123. This affidavit contains information regarding potential targets, which if unsealed may jeopardize the very information sought to be gained by these search warrants. In light of the ongoing nature of the investigation, and the likelihood that notice to above-identified individuals may cause them to destroy evidence, flee from prosecution, and notify confederates, I request that this affidavit and the resulting search and arrest warrants be sealed on the Court's docketing system, with the exception of copies utilized by law enforcement officers participating in the investigation and a copy of the search and arrest

warrants and an inventory of any items seized that will be left at the locations of the execution of the search warrants.

I hereby request that search warrants be issued for the locations described in **Attachments A-1** through **A-4**.

I swear, under the penalty of perjury, that the foregoing information is true and correct to the best of my knowledge, information, and belief.

ROBERT L. BORKHUIS
DEA Special Agent


Sworn and Subscribed to me on March  8 , 2019


Hon. Allison Claire
United States Magistrate Judge


Approved as to form:

Amanda Beck
Assistant United States Attorney

**Attachment A-2**

**3273 Juliet Road, Stockton, California 95205**

The parcel number (APN) for 3273 Juliet Road, Stockton, California 95205 is 173-360-160-000.

This residence is a single-story dwelling with an attached garage.  It is located near the intersection of Juliet Road and Tarragona Way.

The building is light tan in color.  There is a chain-link fence that appears to stretch across the east, north, and most of the west sides of the property.  The garage door is white.

The main entrance for the house is on the south side of the main structure, just east of the attached garage.  The trim line where the roof meets the wall is white and surrounds the entirety of the building.  The window trim for the building is also white.  An enclosed structure is attached to the north side of the building.  This addition is white on three sides and attached to the main building on the fourth.



**ATTACHMENT B**

**ITEMS TO BE SEARCHED FOR AND SEIZED FROM THE PREMISES AND FROM ANY CLOSED ITEMS AND CONTAINERS FOUND THEREIN**

Agents are authorized to search and seize property that constitutes evidence, fruits, proceeds, and instrumentalities of violations of the following federal statutes (the "Target Offenses") believed to have been committed by Manuel FELIX-RIVERA:

1.   21 U.S.C. § 841(a)(1) – Distribution and Possession with Intent to Distribute Fentanyl

As further described in the affidavit, the specific evidence, fruits, proceeds and instrumentalities of the Target Offenses for which agents may search includes:

1.   Any fentanyl, illegal drugs or drug paraphernalia, including scales, measuring devices, and weighing devices; narcotics diluting or cutting agents; narcotics packaging materials, including plastic, tin foil, cellophane, jars, plastic bags, and other containers;

2.   United States currency and foreign currency linked to drug trafficking and/or the proceeds of drug trafficking;

3.   Money ledgers, narcotics distribution or customer lists, narcotics supplier lists, correspondence, notations, logs, receipts, journals, books, pay and owe sheets, records and other documents noting the price, quantity, date and/or times when narcotics were purchased, possessed, transferred, distributed, sold or concealed; computer disks, computer printouts, computer codes and computer programs in addition to computer hard disks, computer screens, computer keyboards, directory disks, all computer components which operate computers and which would reveal the receipt of proceeds from heroin or fentanyl distribution and the transfer, investment, control and disposition of those proceeds;

4.   Bank account records, wire transfer records, bank statements, safety deposit keys and records, money wrappers, money containers, income tax returns, evidence of financial transfer, or movement of money generated from the sale of narcotics;

5.   Telephone paging devices, beepers, mobile phones, car phones, answering machines and tapes, and other communication devices which evidence participation in a conspiracy to distribute controlled substances;

6.   Personal telephone and address books and listings, letters, cables, telegrams, telephone bills, photographs, audio and video tapes, personal notes and other items reflecting names, addresses, telephone numbers,

1

communications, and illegal activities of associates in drug trafficking activities;

7. Financial instruments purchased with large amounts of currency derived from the sale of controlled substances, including travelers checks, bonds, stock certificates, cashier's checks and certificates of deposit; money counting machines, money wrappers and bags used to carry controlled substances;

8. Records, documents and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry, or other items obtained with the proceeds of the sales of controlled substances;

9. Records, items, and documents reflecting travel, including airline tickets, credit card receipts, travel vouchers, hotel and restaurant receipts, canceled checks, maps and written directions to location;

10. Handguns, shotguns, rifles, ammunition and other firearms possessed in relation to drug trafficking or discovered in the possession of a prohibited person;

11. Devices commonly used to conduct counter-surveillance against law enforcement including, but not limited to, scanners, police radios, surveillance cameras, recordings of surveillance footage, monitors, anti-bugging devices, and devices used to detect the presence of wiretaps, recording devices, transmitters, and/or receipts or literature describing the same;

12. Personal property tending to show the existence and/or location of other stored narcotics including, but not limited to, storage locker receipts, records, and maps, safety deposit keys and corresponding;

13. Indicia of occupancy, residency, control or ownership of the premises and things described in this warrant, including utility bills, telephone bills, loan payment receipts, rent documents, canceled envelopes and keys, photographs, and bank records.

2

# UNITED STATES DISTRICT COURT

for the

Eastern District of California

| | |
|---|---|
| In the Matter of the Search of<br><br>3273 Juliet Road<br>Stockton, California 95205 | )<br>)<br>)<br>)<br>)<br>) | Case No.<br><br>**2: 1 9 - SW - 0 1 8 3    AC** |

## SEARCH AND SEIZURE WARRANT

To:    Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____Eastern_____ District of _____California_____ *(identify the person or describe the property to be searched and give its location)*:

**SEE ATTACHMENT A-2, attached and incorporated by reference.**

*SEALED*

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

**SEE ATTACHMENT B, attached and incorporated by reference.**

**YOU ARE COMMANDED** to execute this warrant on or before _____03/22/2019_____ *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.    ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to: <u>any authorized U.S. Magistrate Judge in the Eastern District of California.</u>

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐   for _____ days *(not to exceed 30)* ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:    _____3/8/19    11:00 a_____            _____
                                                                                                      *Judge's signature*

City and state:    _____Sacramento, California_____        _____Allison Claire, U.S. Magistrate Judge_____
                                                                                                  *Printed name and title*

## Return

| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|
| | | |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

## Certification

I swear that this inventory is a true and detailed account of the person or property taken by me on the warrant.

_____

Subscribed, sworn to, and returned before me this date.

_____          _____
Signature of Judge                                                    Date

**Attachment A-2**

**3273 Juliet Road, Stockton, California 95205**

The parcel number (APN) for 3273 Juliet Road, Stockton, California 95205 is 173-360-160-000.

This residence is a single-story dwelling with an attached garage. It is located near the intersection of Juliet Road and Tarragona Way.

The building is light tan in color. There is a chain-link fence that appears to stretch across the east, north, and most of the west sides of the property. The garage door is white.

The main entrance for the house is on the south side of the main structure, just east of the attached garage. The trim line where the roof meets the wall is white and surrounds the entirety of the building. The window trim for the building is also white. An enclosed structure is attached to the north side of the building. This addition is white on three sides and attached to the main building on the fourth.



## ATTACHMENT B

## ITEMS TO BE SEARCHED FOR AND SEIZED FROM THE PREMISES AND FROM ANY CLOSED ITEMS AND CONTAINERS FOUND THEREIN

Agents are authorized to search and seize property that constitutes evidence, fruits, proceeds, and instrumentalities of violations of the following federal statutes (the "Target Offenses") believed to have been committed by Manuel FELIX-RIVERA:

1. 21 U.S.C. § 841(a)(1) – Distribution and Possession with Intent to Distribute Fentanyl

As further described in the affidavit, the specific evidence, fruits, proceeds and instrumentalities of the Target Offenses for which agents may search includes:

1. Any fentanyl, illegal drugs or drug paraphernalia, including scales, measuring devices, and weighing devices; narcotics diluting or cutting agents; narcotics packaging materials, including plastic, tin foil, cellophane, jars, plastic bags, and other containers;

2. United States currency and foreign currency linked to drug trafficking and/or the proceeds of drug trafficking;

3. Money ledgers, narcotics distribution or customer lists, narcotics supplier lists, correspondence, notations, logs, receipts, journals, books, pay and owe sheets, records and other documents noting the price, quantity, date and/or times when narcotics were purchased, possessed, transferred, distributed, sold or concealed; computer disks, computer printouts, computer codes and computer programs in addition to computer hard disks, computer screens, computer keyboards, directory disks, all computer components which operate computers and which would reveal the receipt of proceeds from heroin or fentanyl distribution and the transfer, investment, control and disposition of those proceeds;

4. Bank account records, wire transfer records, bank statements, safety deposit keys and records, money wrappers, money containers, income tax returns, evidence of financial transfer, or movement of money generated from the sale of narcotics;

5. Telephone paging devices, beepers, mobile phones, car phones, answering machines and tapes, and other communication devices which evidence participation in a conspiracy to distribute controlled substances;

6. Personal telephone and address books and listings, letters, cables, telegrams, telephone bills, photographs, audio and video tapes, personal notes and other items reflecting names, addresses, telephone numbers,

communications, and illegal activities of associates in drug trafficking activities;

7.  Financial instruments purchased with large amounts of currency derived from the sale of controlled substances, including travelers checks, bonds, stock certificates, cashier's checks and certificates of deposit; money counting machines, money wrappers and bags used to carry controlled substances;

8.  Records, documents and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry, or other items obtained with the proceeds of the sales of controlled substances;

9.  Records, items, and documents reflecting travel, including airline tickets, credit card receipts, travel vouchers, hotel and restaurant receipts, canceled checks, maps and written directions to location;

10. Handguns, shotguns, rifles, ammunition and other firearms possessed in relation to drug trafficking or discovered in the possession of a prohibited person;

11. Devices commonly used to conduct counter-surveillance against law enforcement including, but not limited to, scanners, police radios, surveillance cameras, recordings of surveillance footage, monitors, anti-bugging devices, and devices used to detect the presence of wiretaps, recording devices, transmitters, and/or receipts or literature describing the same;

12. Personal property tending to show the existence and/or location of other stored narcotics including, but not limited to, storage locker receipts, records, and maps, safety deposit keys and corresponding;

13. Indicia of occupancy, residency, control or ownership of the premises and things described in this warrant, including utility bills, telephone bills, loan payment receipts, rent documents, canceled envelopes and keys, photographs, and bank records.